<u>**NOT FOR PUBLICATION**</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| JAMES and MANUELA SINES, on behalf of themselves and all others similarly situated, | |
| *Plaintiffs*, | Civil Action No. 19-19121 |
| v. | **OPINION** |
| DARLING INGREDIENTS INC., | |
| *Defendant*. | |

**PADIN, District Judge.**

Plaintiffs are a putative class of Jersey City residents who allege that Defendant Darling Ingredients Inc. ("Darling"), which operates a Newark animal rendering facility, releases noxious odors into the environment which reduce Plaintiffs' property values.  D.E. 2 ("Am. Compl.") ¶¶ 3, 6, 16-19.  Plaintiffs move for class certification pursuant to Federal Rule of Civil Procedure 23. D.E. 70 ("Class Cert. Mot.").  Darling opposes.  D.E. 78 ("Class Cert. Opp'n").  Darling also moves, pursuant to Federal Rule of Evidence 702, to exclude the testimony of two experts offered in connection with class certification: Mark Cal and Theodore Lamicella.  D.E. 72 ("Cal Daubert Mot."); D.E. 73 ("Lamicella Daubert Mot.").  Plaintiffs oppose these motions.  D.E. 76 ("Cal Daubert Opp'n"); D.E. 77 ("Lamicella Daubert Opp'n").  The Court has reviewed all relevant submissions and considered the motions without oral argument.[1]  *See* Fed. R. Civ. P. 78(b); L.

---

[1] Plaintiffs have filed a reply in support of the class certification motion.  D.E. 82 ("Class Cert. Reply").  Likewise, Darling has filed replies in support of the motions to exclude expert testimony. D.E. 79 ("Cal Daubert Reply"); D.E. 80 ("Lamicella Daubert Reply").

Civ. R. 78.1(b).  For the following reasons, the Court will GRANT the motions to exclude and DENY the motion for class certification.[2]

## I.     BACKGROUND[3]

Darling operates an animal rendering facility that is surrounded by residential properties, including the properties where Plaintiffs reside.  Am. Compl. ¶¶ 16-17.  Plaintiffs allege that the Darling animal rendering facility releases noxious odors that enter the surrounding residential properties, contaminate the air, disturb residents' use and enjoyment, and diminish property values. *Id.* ¶¶ 18-19, 83-84, 92, 106-07.  Plaintiffs seek relief on behalf of a putative class of owner-occupants and renters on theories of nuisance, trespass, and negligence.  *Id.* ¶¶ 87, 100, 108.

Initially, Plaintiffs defined the putative class as all owner-occupants and renters of residential property within 1.75 miles of the Darling animal rendering facility.  *Id.* ¶ 59.  However, in the present class certification motion, Plaintiffs modify the putative class to include only those owner-occupants and renters of residential property within a pre-defined geographic area in Jersey City, across the bay from Darling's facility.  Class Cert. Mot. at 1-2; *see also* D.E. 70-2 (proposed class area map).  Plaintiffs seek to certify this putative class pursuant to Rule 23(a) and Rule 23(b)(3).  D.E. 70-1 ("Class Cert. Br.") at 9, 48.

---

[2] The Court will grant the motions to exclude without a hearing because there is "a sufficient record upon which to rely, including [the] expert report and the parties' submissions, rendering a *Daubert* hearing unnecessary."  *Antonio v. Progressive Ins. Co.*, 795 Fed. App'x 128, 131 (3d Cir. 2020); *see also Oddi v. Ford Motor Co.*, 234 F.3d 136, 154 (3d Cir. 2000) (affirming the exclusion of expert testimony without a hearing because "the district court already had before it the depositions and affidavits of the plaintiff's experts").  In any event, Plaintiffs do "not even begin to suggest how such a hearing would have advanced [their] position, and we can not begin to imagine that it would have" because the class certification motion would be denied even if the expert testimony was not excluded.  *Oddi*, 234 F.3d at 154.

[3] This section is based on the Amended Complaint's allegations.  At this stage, the Court does not accept the class allegations as true.

To meet class certification requirements, Plaintiffs offer expert testimony from Mark Cal and Theodore Lamicella. *See, e.g.*, *id.* at 26-30. Plaintiffs offer Cal's testimony to provide a class-wide method for determining whether Darling emitted odors throughout the proposed class area, as well as the extent of any odor emissions. *See* D.E. 70-29 at 5 (Cal Rpt.). Relatedly, Plaintiffs offer Lamicella's testimony to provide a class-wide method for determining whether Darling caused damages, as well as the measure of any damages. *See* D.E. 70-30 at 3 (Lamicella Decl.). However, Darling asserts that both experts' testimony is inadmissible under Rule 702 and the standard set out in *Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579 (1993). D.E. 72-1 ("Cal Daubert Br."); 73-1 ("Lamicella Daubert Br."). Accordingly, Darling has moved to exclude both experts. Cal Daubert Mot. at 2; Lamicella Daubert Mot. at 2.

## II.    LEGAL STANDARDS

A "party proposing class-action certification bears the burden of affirmatively demonstrating by a preponderance of the evidence [its] compliance with the requirements of Rule 23." *Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015), *as amended* (Apr. 28, 2015). Specifically, "every putative class action must satisfy the four requirements of Rule 23(a) and the requirements of either Rule 23(b)(1), (2), or (3)." *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 590 (3d Cir. 2012).

Under Rule 23(a), a class may be certified only if: (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a)(1)-(4). These requirements are, respectively, referred to as the numerosity, commonality, typicality, and adequacy requirements. *See, e.g.*, *Marcus*, 687 F.3d at 590-91.

Under Rule 23(b)(3), a party who seeks class certification must satisfy three additional requirements.  First, the party must prove "that the class is ascertainable."  *Byrd*, 784 F.3d at 163.  Second, the party seeking class certification must establish that "questions of law or fact common to class members predominate over any questions affecting only individual members" of the class.  Fed. R. Civ. P. 23(b)(3).  Third, the party must show "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  *Id.*  These additional requirements are, respectively, referred to as the ascertainability, predominance, and superiority requirements.  *See, e.g.*, *Byrd*, 784 F.3d at 161 n.4, 162, 164.

A party who seeks class certification cannot "demonstrate conformity with Rule 23" through "challenged expert testimony" unless the party also proves "that the expert testimony satisfies the standard set out in *Daubert*" and Rule 702.  *In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 187 (3d Cir. 2015).  According to the standard set out in *Daubert*, the district court acts as a "gatekeeper" pursuant to Rule 702 to ensure that "any and all expert testimony or evidence is not only relevant, but also reliable."  509 U.S. at 589.  Under Rule 702 and *Daubert*, the district court must consider: (1) the "qualifications" of the expert, (2) the "reliability" of the expert methodology, and (3) the "fit" between the expert analysis and the case.  *In re Paoli R.R. Yard Pcb Litig.*, 35 F.3d 717, 741-43 (3d Cir. 1994); *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000).  The party offering the expert testimony bears the burden of demonstrating compliance with these requirements by a preponderance of the evidence.  *See Padillas v. Stork-Gamco, Inc.*, 186 F.3d 412, 418 (3d Cir. 1999).[4]

---

[4] Plaintiffs are correct that the "'[t]he trial court's gatekeeping function is . . . reduced when the gatekeeper is keeping the gate only for himself.'"  Cal Daubert Opp'n at 29 (quoting *In re Tropicana Orange Juice Mktg. & Sales Practices Litig.*, 2017 WL 2362848, at *2 (D.N.J. May 31, 2017)); Lamicella Daubert Opp'n at 19 (same).  Nevertheless, the "rigorous analysis" of class certification "applies to expert testimony critical to proving class certification requirements."

### III.   ANALYSIS

Plaintiffs' putative class does not satisfy Rule 23.  Specifically, the putative class fails the adequacy requirement of Rule 23(a) and the ascertainability, predominance, and superiority requirements of Rule 23(b)(3).  Additionally, Plaintiffs' expert testimony does not satisfy Rule 702 or *Daubert*; Cal and Lamicella propose approaches that fail the reliability and fit requirements, and Lamicella also fails the qualifications requirement.  Importantly, even if the Court does not exclude the relevant expert testimony, it would still decline to certify the class.

### A.  The Putative Class Does Not Satisfy Rule 23(a)

Although Plaintiffs' putative class satisfies the numerosity, commonality, and typicality requirements, it fails the adequacy requirement of Rule 23(a).[5]

#### 1.  The Numerosity Requirement is Satisfied

"No minimum number of plaintiffs is required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met."  *Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001).  Here, Plaintiffs have demonstrated that there are 3,550 households in the proposed class area.  D.E. 70-11 at 2 (Roman Decl.).[6]  Thus, the numerosity requirement is satisfied.

---

*Blood Reagents Antitrust Litig.*, 783 F.3d at 187 (internal citations omitted).  Therefore, the Court will consider the qualifications, reliability, and fit of the experts and their approaches, notwithstanding the absence of a jury.

[5] Importantly, "putative class members need not establish Article III standing."  *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 362 (3d Cir. 2015).  Darling argues that this holding "was abrogated by *Ramirez* and is wrong."  Class Cert. Opp'n at 29 n.8.  However, in *Ramirez*, the Supreme Court held that every class member must establish standing to recover *after* class certification; it did not "address the distinct question [of] whether every class member must demonstrate standing *before* a court certifies a class."  *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 n. 4 (2021).  At this stage, "the problem of un-injured absent class members is a problem of Rule 23, not of Article III."  *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1273 (11th Cir. 2019) (internal citations omitted).

[6] Matthew Roman is a paralegal at Liddle Sheets Coulson P.C., Plaintiffs' counsel.

2.  *The Commonality Requirement is Satisfied*

"[T]he commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class."  *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 264 (3d Cir. 2009) (internal citations omitted).  Additionally, the common question "must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

Here, Plaintiffs have demonstrated that the putative class shares questions of fact and law that are capable of class-wide resolution.  In New Jersey, a public nuisance is "an unreasonable interference with the exercise of a right common to the general public" and a private nuisance is "an [unreasonable] invasion of another's interest in the use and enjoyment of land."[7]  *Mayor & Council of Borough of Rockaway v. Klockner & Klockner*, 811 F. Supp. 1039, 1056 (D.N.J. 1993); *Smith v. Honeywell Int'l Inc.*, 2011 WL 810065, at *3 (D.N.J. Feb. 28, 2011) (internal citations omitted).  Relatedly, negligence entails "(1) a duty of care owed by defendant to plaintiff; (2) a breach of that duty by defendant; and (3) an injury to plaintiff proximately caused by [that] breach."[8]  *Optica, Inc. v. Metro Pub. Adjustment, Inc.*, 2005 WL 1719134, at *16 (D.N.J. July 21, 2005).  Most of the common questions proposed by Plaintiffs are plainly relevant to these factual and legal determinations.[9]  And since a trespass is "an [unauthorized] entry onto another's

---

[7] Although the Amended Complaint referenced nuisance in general, the Court previously held that Plaintiffs sufficiently pled public nuisance and private nuisance.  D.E. 30 at 3 n.1.

[8] Although the Amended Complaint referenced negligence and gross negligence, the Court previously held that "[g]ross negligence and negligence claims consist of the same elements . . . ." D.E. 30 at 10.

[9] For example, the following shared questions are clearly relevant: "whether Defendant interfered with a right common to the public" (public nuisance); "what constitutes a substantial and unreasonable interference for a normal person in the community" (private nuisance); "whether the NJDEP's repeated issuance of NOVs constituted conduct proscribed by a statute, ordinance, or

property," another shared question is whether the dispersion of noxious odors constitutes an entry onto property. *Rowe v. E.I. Dupont De Nemours & Co.*, 262 F.R.D. 451, 463 (D.N.J. 2009). Ultimately, these common questions can be resolved in one stroke, as they concern Darling or objective inquiries, rather than Plaintiffs or the putative class. Accordingly, the commonality requirement is satisfied.[10]

### 3. The Typicality Requirement is Satisfied

To determine whether the typicality requirement has been satisfied, "courts must consider the attributes of the proposed representatives, the class as a whole, and the similarity between the proposed representatives and the class." *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 597 (3d Cir. 2009). "If the claims of the named plaintiffs and putative class members involve the same conduct by the defendant, typicality is established regardless of factual differences." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 183-84 (3d Cir. 2001), *as amended* (Oct. 16, 2001).

Here, the claims of the named Plaintiffs and the putative class members involve the same conduct by the same defendant. The proposed representatives are James and Manuela Sines, whose attributes echo the class a whole. According to the data sheet submitted to Plaintiffs' counsel, the Sines have owned and occupied a residential property in Jersey City for over 10 years

---

administrative regime" (negligence); "whether Defendant acted intentionally or unreasonably in causing off-site odor emissions" (private nuisance and public nuisance); "whether or not Defendant failed to adequately utilize each of the available odor mitigation techniques in its operation of the Facility" (public nuisance, private nuisance, and negligence); "whether Defendant's conduct is of a continuing nature" (same). Class Cert. Br. at 35-36.

[10] Darling argues that commonality is not satisfied because "conflicting answers to key liability questions" remain. Class Cert. Opp'n at 30. However, Plaintiffs' only burden is to show a single common question that is capable of class-wide resolution. In any event, "this individualized issue is more appropriately analyzed under [another] requirement" for Rule 23, such as predominance. *Jane v. Rodriguez*, 2020 WL 6867169, at *5 n.5 (D.N.J. Nov. 23, 2020).

and have noticed odors of "rotting animal carcasses" from Darling throughout that time.  D.E. 70-24; *see also* D.E. 70-25 at 7, 14 (Manuela Sines Tr.).  Moreover, Manuela Sines has testified that "this ugly smell of rotten meat" disturbs her enjoyment of the outdoors and affects the value of her home.  D.E. 70-25 at 13-14 (Manuela Sines Tr.).  Thus, the typicality requirement is satisfied.[11]

### 4.   The Adequacy Requirement is Not Satisfied

Adequacy is established if the proposed representatives have "the ability and the incentive to represent the claims of the class vigorously" and if "there is no conflict between the individual's claims and those asserted on behalf of the class."  *In re Cmty. Bank of N. Va.*, 622 F.3d 275, 291 (3d Cir. 2010) (internal citations omitted), *as amended* (Oct. 20, 2010).  To satisfy the adequacy requirement, "the named plaintiff's interests must be sufficiently aligned with the interests of the absentees" and "the plaintiff's counsel must be qualified to represent the class."  *Beneli v. BCA Fin. Servs., Inc.*, 324 F.R.D. 89, 98 (D.N.J. 2018).

Here, Plaintiffs' counsel is qualified to represent the class, but the named Plaintiffs' interests are not sufficiently aligned with the interests of the absentees.  Plaintiffs' counsel has experience with "environmental class actions of this type" and "knowledge, expertise, and resources" to litigate this case.  D.E. 70-31 at 2 (Sheets Decl.).[12]  However, the named Plaintiffs have admitted that they are "not seeking damages for physical injury" and that "the claims made in this case are limited to claims of property damages."  D.E. 78-44 at 3, 6 (Pls.' Resp. and Obj. to Def.'s First Req. for Admis.).  Yet numerous putative class members have described adverse health impacts in data sheets.  *See, e.g.*, D.E. 70-22 at 31, 38, 45, 71, 121, 123, 138.  Because class actions

---

[11] Darling argues that "the conflicts of interest that render Plaintiffs inadequate also defeat typicality," but this issue is more appropriately analyzed under the adequacy requirement.  Class Cert. Opp'n at 34.

[12] Laura Sheets is an attorney at Liddle Sheets Coulson P.C., the law firm retained to represent Plaintiffs.

have preclusive effects on the entire class, "a plaintiff proposing to be a class representative cannot adequately do so where that plaintiff has voluntarily for[e]gone personal injury claims" and "multiple data sheets suggest that some plaintiffs may have personal injury claims." *Thornburg v. Ford Motor Co.*, 2022 WL 4348475, at *7 (W.D. Mo. Sept. 19, 2022) (internal citations omitted); *see also Taylor v. Sturgell*, 553 U.S. 880, 894 (2008) (claim preclusion applies to class actions); *City Select Auto Sales, Inc. v. David Randall Associates, Inc.*, 2012 WL 426267, at *5 (D.N.J. Feb. 7, 2012) (the entire controversy doctrine "is a form of claim preclusion with a slightly broader scope" that applies to a class action if "the class was certified").  In other words, since there is a conflict between the individuals' claims and those asserted on behalf of the class, the proposed representatives do not have the ability and the incentives to represent the claims of the class vigorously.  Accordingly, the adequacy requirement is not satisfied.

### B.  The Putative Class Does Not Satisfy Rule 23(b)(3)

Additionally, Plaintiffs' putative class fails the ascertainability, predominance, and superiority requirements of Rule 23(b)(3).

#### 1.  The Ascertainability Requirement is Not Satisfied

To satisfy the ascertainability requirement, "the class must be defined with reference to objective criteria" and "there must be a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition." *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 355 (3d Cir. 2013).  "If class members are impossible to identify without extensive and individualized fact-finding . . . then a class action is inappropriate." *Marcus*, 687 F.3d at 593.

Here, there is a reliable and administratively feasible mechanism to determine whether a putative class member falls within the class definition.  Specifically, "all that is required is to

determine whether that person's home is geographically located within the class area boundary."

Class Cert. Br. at 32; *see also Lloyd v. Covanta Plymouth Renewable Energy, LLC*, 585 F. Supp.

3d 646, 653 (E.D. Pa. 2022) (there was a feasible mechanism to determine whether a putative class

member resided within 1.5 miles of an alleged odor emitter because "one would only need a map

to discern whether a property is located within this radius").

Darling argues that class members cannot be identified without extensive and

individualized fact-finding because there is "no class-wide means of determining which properties

are residential and which are commercial."  Class Cert. Opp'n at 27; *see also* 78-36 at 31-32

(Lamicella Tr.) (tax assessor data can be inaccurate); 78-43 at 11 (Phillips Rpt.) (same); 78-34 at

8 (Phillips Decl.) (examples of commercial properties with residential units).[13]  However, even if

Plaintiffs would need to consult websites, conduct virtual or drive-by inspections, or occasionally

inquire with occupants, "there are unlikely to be serious administrative burdens that are

incongruous with the efficiencies expected in a class action."  *Byrd*, 784 F.3d at 170 (internal

citations omitted).  In fact, Plaintiffs have indicated that "all class members will receive individual

notice at their residence by first class mail," so it should not be difficult to collect forms detailing

the designations of properties and to check this information against public records or other readily

available information.  Class Cert. Br. at 33; *see also Byrd*, 784 F.3d at 160-61, 169-171; *City

Select Auto Sales Inc.*, 867 F.3d at 441.[14]

---

[13] Trevor Phillips is Managing Director at Alvarez & Marsal Disputes and Investigations, LLC, the firm Darling retained to evaluate alleged loss in property value and alleged loss of use and enjoyment of property.

[14] In *Byrd*, the district court found that it would be unfeasible to identify the household members of owners and lessees, but the Third Circuit reversed, in part because the household members could complete forms detailing their addresses, which could be checked against public records and the owners' and lessees' addresses.  784 F.3d at 160-61, 169-171.  Likewise, in *City Select Auto Sales Inc.*, the Third Circuit held that "[a]ffidavits, in combination with records or other reliable and administratively feasible means, can meet the ascertainability standard."  867 F.3d at 441.

Nevertheless, the class is not defined with reference to objective criteria. Plaintiffs have modified the proposed class area—from the 1.75 miles surrounding the animal rendering facility to a pre-defined geographic area across the bay—but have offered no credible explanation for this change. At most, Plaintiffs have pointed to data sheets collected by Plaintiffs' counsel to assert that the proposed class area is "the most significantly impacted" by the animal rendering facility. Class Cert. Br. at 14 n.1; *see also* 70-3, 70-4, 70-21, 70-22. However, Plaintiffs have also submitted notices of violation and penalty assessments issued to Darling by county health officials and state environmental regulators, and the only locations indicated therein are northwest of Darling, in the opposite direction of the proposed class area. D.E. 71-1 at 17, 25, 62.

Additionally, Plaintiffs have submitted a complaint filed by the New Jersey Department of Environmental Protection, as well as the consent order that terminated the litigation. D.E.s 70-12, 71-2, 71-4. But the underlying complaints that gave rise to the litigation were from Cortland Street in Newark, which is also located northwest of Darling, in the opposite direction of the proposed class area.[15] D.E.s 70-14 at 6, 70-15 at 3, 70-17 at 2 (investigator declarations); *see also* D.E. 78-33 at 2 (underlying complaints map). Clearly, Plaintiffs have based the class definition "upon their own interpretation of the limited information available to them." *Brooks v. Darling Int'l, Inc.*, 2017 WL 1198542, at *7 (E.D. Cal. Mar. 31, 2017) (the class was not objectively defined because the proposed class area was based only on data sheets and complaints to a governmental entity and "not upon any preliminary finding made by their experts"); *see also Thornburg v. Ford Motor Co.*, 2022 WL 4348475, at *5 (W.D. Mo. Sept. 19, 2022) (the class was not objectively defined in part

---

[15] According to the consent order, only two underlying complaints were from Jersey City, and these were verified after the litigation arose. D.E. 71-2 at 4. Likewise, of the approximately 150 complaints that individuals made to the Department and that Plaintiffs have submitted, only 40 were from Jersey City. D.E. 70-5.

because the expert did "not supply any explanation as to why the proposed class area's boundaries were chosen").

Although there is a feasible means to determine class membership without extensive fact-finding, since the class is not defined with reference to objective criteria, the ascertainability requirement is not satisfied.

### 2. The Predominance Requirement is Not Satisfied

The predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation, a standard far more demanding than the commonality requirement of Rule 23(a)." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 310-11 (3d Cir. 2008) (internal citations omitted).  However, predominance does not require absolute identity of the underlying claims.  *See Harnish v. Widener Univ. Sch. of Law*, 833 F.3d 298, 304 (3d Cir. 2016).  "[I]f the court decides that the central, predominant issues in the case are common, then Rule 23(b)(3) is met despite the possibility that some subsidiary issues will require individualized evidence." *Id.*

Here, the putative class is not sufficiently cohesive to warrant adjudication by representation because the central, predominant issues in the case require individualized evidence. To assess liability, the fact finder must determine: (1) whether Darling emitted odors throughout the class area; (2) whether the odor emissions were unreasonable, unauthorized, or a breach of the duty of care; and (3) whether Darling interfered with a public right to unpolluted air, invaded a private interest in the use or enjoyment of property, or proximately caused injury to class members. Put simply, liability depends upon the extent of emissions, their potential justifications, and any resulting impacts.  Even if there is a common basis to evaluate justifications—because the relevant

facts concern Darling, rather than the putative class—Plaintiffs have not provided class-wide means to analyze emissions or impacts.

Plaintiffs have retained Mark Cal and Theodore Lamicella to provide class-wide means for determining, respectively, the extent of emissions and any resulting impacts.   However, their expert testimonies are inadmissible under Rule 702 and *Daubert*, as they do not uniformly satisfy the qualifications, reliability, and fit requirements.

   a.   *Qualifications, Reliability, and Fit*

First, to satisfy the qualifications requirement, an expert must have "specialized knowledge" in the relevant area, whether through "practical experience" or "academic training and credentials."  *Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir. 1998) (internal citations omitted).  In general, the Third Circuit has been "satisfied with more generalized qualifications."  *In re Paoli*, 35 F.3d at 741.

Second, to satisfy the reliability requirement, a methodology must be based upon "the methods and procedures of science rather than on subjective belief or unsupported speculation" and the expert have "good grounds for his or her belief."  *Calhoun v. Yamaha Motor Co., U.S.A.*, 350 F.3d 316, 321 (3d Cir. 2003) (internal citations omitted).  Relevant considerations include the testability, controlling standards, and error rates of the methodology, as well as any peer review or general acceptance in the scientific community.  *In re Paoli*, 35 F.3d at 742 & n.8.

Third, to satisfy the fit requirement, an expert analysis must be "sufficiently tied to the facts of the case [such] that it will aid the jury in resolving a factual dispute."  *Daubert*, 509 U.S. at 591 (internal citations omitted).  In other words, "the connection between the scientific knowledge and the case must itself constitute scientific knowledge," which is a standard "higher than bare relevance."  *In re Paoli*, 35 F.3d at 745 n.13.

Here, the qualifications, reliability, and fit requirements are not uniformly satisfied.  As an initial matter, Lamicella does not have specialized knowledge in the relevant areas, whether through practical experience or academic training and credentials.  Even at a general level, Lamicella is not qualified to apply the methodology or analysis that he previews.  Additionally, Lamicella and Cal do not offer methods and procedures of science for which there are good grounds.  Although each proposes an approach with abstract appeal, neither has obtained peer review, and as applied to this case, their methodologies are not testable or subject to controlling standards or error rates.[16]  Likewise, Lamicella and Cal offer analyses that are not sufficiently tied to the facts of the case.  Indeed, neither supplies any meaningful connection between his scientific knowledge and the case.

### b.  Mark Cal's Expert Testimony is Inadmissible Under Rule 702 and Daubert

Mark Cal is an environmental engineer who is certified by the State of New Mexico and the American Academy of Environmental Engineers and Scientists.  D.E. 70-29 at 17 (Cal Rpt.).  Cal has a B.S. in Chemical Engineering and an M.S. and Ph.D. in Civil and Environmental Engineering from the University of Illinois at Urbana-Champaign.  *Id.*  In addition to a multi-decade career in academia, Cal has long been the sole proprietor of a consulting firm that specializes in air quality engineering and atmospheric dispersion modeling.  *Id.* at 17-18.  Although Cal is qualified, his methodology is unreliable and his analysis does not fit the case.

### i.  Cal Offers Boilerplate Opinions

To measure the extent of emissions, Cal proposes to employ AERMOD, which he describes as "the preferred atmospheric dispersion model used by local, state and federal regulatory agencies

---

[16] Even if Cal's model has general acceptance in the scientific community, his methodology is still unreliable.  Moreover, Lamicella's methodology has not been generally accepted in the scientific community.

and in non-regulatory situations, such as modeling of odor dispersion." *Id.* at 2, 12.  According to Cal, AERMOD "can determine the frequency, intensity and location of nuisance level odors within the proposed class area." *Id.*  However, Cal has not run AERMOD for the Darling facility in Newark, and he could not testify with a reasonable degree of certainty that he would be able to run the model for the animal rendering plant.  D.E. 72-3 at 22, 34 (Cal Tr.).  Instead, Cal has authored a preliminary report that describes the required inputs and expected outputs of AERMOD in general terms, but that does not explain how AERMOD can or will be applied to this specific case. D.E. 70-29 (Cal Rpt.).  Even if Cal has demonstrated that AERMOD constitutes scientific knowledge, he has not demonstrated that the connection between AERMOD and the case itself constitutes scientific knowledge.[17]   In fact, Cal has not described any connection between AERMOD and the case, so no tests or controlling standards can be implemented, and no error rates can be discerned.

### ii. Cal Does Not Have the Necessary Data

Although Cal is not obligated to determine the extent of emissions at this stage, he must demonstrate that his methodology and analysis are ultimately capable of determining emissions. Put differently, while Cal is not required to produce the expected outputs of AERMOD, he must assess the availability of necessary inputs for the model if he wishes to demonstrate the reliability and fit of his approach.  However, Cal has not investigated the "real-world input data" needed to run AERMOD, including the emissions data that serve as a critical input for the model.  *Id.* at 8; D.E. 72-3 at 15-16 (Cal Tr.).  As a result, he does not know whether such data exist or where such data could be located.  D.E. 72-3 at 15-16 (Cal Tr.).  Cal has suggested that emissions data can be

---

[17] Nor has Cal demonstrated that AERMOD has been subject to peer review.  At most, he suggests that the "general principles of AERMOD" are based upon "scientific literature, publications, and peer review . . . ."  D.E. 76-1 at 8 (Cal Decl.).

"determined by on-site testing or estimated with emissions factors."  D.E. 70-29 at 8 (Cal Rpt.). But he has not investigated possible changes in odor control equipment, policies, or practices, so his on-site testing would not necessarily reflect past emissions data.  D.E. 72-3 at 13-15 (Cal Tr.). Likewise, he has not investigated the production rates or feed rates of raw materials, which are critical to estimate emissions data using emissions factors.[18]  *Id.* at 16-19.  Without emissions data or information about odor control changes or production and feed rates, Cal cannot run an accurate AERMOD model.  *Id.* at 20-22.

Cal speculates that permits might require facilities to maintain the necessary data for an AERMOD model, including information about changes in odor control equipment.  *Id.* at 21, 32. However, corporate representative William Frish has testified that Darling does not measure emissions from its Newark facility, and expert witness Karen Vetrano has investigated and confirmed that emissions data do not exist.  D.E. 79-5 at 5 (Frish Tr.); D.E. 72-5 at 4, 30 (Vetrano Rpt.).

Plaintiffs attempt to discredit Vetrano by suggesting "that all she does is 'interpret the output information.'"  Class Cert. Reply at 9 n.12.  But Plaintiffs misconstrue the relevant testimony, which indicates that Vetrano has experience assisting the development of AERMOD models, specifically with respect to emissions inputs.  D.E. 82-3 at 7-8 (Vetrano Tr.).  In any event,

---

[18] Cal has suggested that he could "perform a search for publicly available emission factors" or that "a firm could be retained to measure emission factors for odorous species emitted from the Darling Facility."  D.E. 76-1 at 9 (Cal Decl.).  However, he has done no work to assess whether public searches would be fruitful, and measurements from a firm would face the same obstacles as on-site testing.  Cal also speculates about the potential of "other data" as inputs, but he does provide any detail about the nature or sufficiency of this information vis-a-vis AERMOD modeling.  *Id.*

Plaintiffs have not demonstrated that Cal satisfies Rule 702 and *Daubert*, even if the Court disregards the Vetrano's opinions.[19]

Finally, Plaintiffs argue that Darling has exploited the bifurcation of discovery to withhold important emissions information. Cal Daubert Opp'n at 25. The discovery requests and responses, however, tell a different story. After Plaintiffs requested the production of various documents that concerned emissions, Darling responded that it would "conduct a reasonable search for any non-privileged formal reports or analyses it performed relating to the emission of odors that can be detected outside of Darling's Newark facility." D.E. 76-7 at 7-9, 12-13, 23-28. Although Darling also objected to the extent Plaintiffs sought "merits discovery" for class certification, Plaintiffs have not demonstrated that Darling ultimately withheld any emissions data. *Id.* On the contrary, Darling communicated to Plaintiffs that it "conducted a reasonable search for non-privileged documents . . . and produced such documents to the extent they exist, if at all." D.E. 79-6 at 3-4.

### iii. Cal Does Not Account for Other Odor Sources

According to Cal, an AERMOD model must consider all potential sources of odors that can be smelled within the proposed class area. D.E. 72-3 at 31-33 (Cal Tr.). Potential sources of odor near Jersey City include the Newark facilities of Passaic Valley Sewage Commission, Dart Transfer Station, American Halal, Firmenich Chemicals, Elan Chemicals, Equistar Chemicals, Sunoco, Shell, Covanta Essex, and Buckeye Terminals. D.E. 72-5 at 13-17 (Vetrano Rpt.). In fact, community members have filed complaints with the Essex Regional Health Commission regarding suspected odors from Passaic Valley Sewage Commission, American Halal, and Covanta Essex. D.E. 78-9 at 2-5; D.E. 78-11 at 2; D.E. 78-14 at 2-6, 9. Yet Cal has not

---

[19] For the same reason, it is immaterial that Frish has expressed some ambivalence about the available data or that Vetrano may not have firsthand knowledge of the available data. *See* D.E. 79-5 at 3-4 (Frish Tr.); D.E. 72-5 at 29 (Vetrano Rpt.).

investigated whether odors smelled within the proposed class were generated by other sources. *Id.* at 30-31.

Although Cal has not considered other facilities, many of the data sheets from surrounding residents reported smells that could have originated from other sources, including sewage, feces, and rotten egg odors.[20] D.E.s 70-3, 70-4, 70-21, 70-22; *see also* D.E. 72-5 at 37-39 (Vetrano Rpt.). Additionally, many of the surrounding residents who completed data sheets later testified that they did not intend to attribute the odors to Darling, and much of their testimony described smells associated with other facilities.[21] *See, e.g.*, D.E. 78-19 at 4-5 (Circhlow Tr.); D.E. 78-20 at 4 (Canfield Tr.); D.E. 78-24 at 4 (Yau-Hopf Tr.); D.E. 78-25 (Vega Decl.); D.E. 78-26 (Alfaro Decl.); D.E. 78-27 (Calianese Decl.); D.E. 78-28 (Green Decl.); D.E. 78-32 (Burno Decl.); D.E. 70-39 at 28 (Caporale Decl.); *see also* 72-5 at 33-37, 40, 44 (Vetrano Rpt.).[22] Likewise, of the nearly 100 surrounding residents who provided Darling with signed statements, many identified smells or odors that likely originated from other sources.[23] D.E. 70-37, 70-38, 70-39, 70-40, 70-47; *see also* D.E. 72-5 at 40, 44 (Vetrano Rpt.).

Put simply, "several other possible sources of noxious odors" could have been detected in the proposed class area, and not "every person . . . was complaining about the same smell."

---

[20] Cal has conceded that surrounding residents who reported sewage, feces, or rotten egg smells could have perceived odors that were emitted by waste-water treatment plants, landfills, or garbage collection centers. D.E. 72-3 at 9-12, 36-38 (Cal Tr.).

[21] It is plausible that the putative class members did not intend to attribute the odors to Darling, as the data sheets presupposed that Darling was responsible for the smells. Specifically, the data sheets listed Darling atop the form and placed a checkbox near the question about odors from Darling, leaving little room to blame other facilities. D.E. 70-3, 70-4, 70-21, 70-22.

[22] Eugene Critchlow, William Canfield, Pearl Yau-Hopf, Veronica Vega, Rafaelita Alfaro, Pamela Calianese, Hazel Green, Katherine Burno, and Gary Caporale are Jersey City residents.

[23] The community member complaints to the Essex County Regional Health Commission also included descriptions of odors that likely originated from sources other than Darling, such as sewage, garbage, and chemical smells. D.E. 78-9 at 2-5; D.E. 78-11 at 2; D.E. 78-14 at 2-6, 9.

*Hamilton v. 3D Idapro Sols., LLC*, 2019 U.S. Dist. LEXIS 128217, at *8 (W.D. Wis. Aug. 1, 2019). Thus, Plaintiffs have "not shown that odors suffered by the class area can be traced to a common defendant." *Id.* at 7. Cal has suggested that AERMOD can measure "total impact from multiple sources" and that "source groups can be turned on or off to see their contribution to the overall pollutant concentrations within a geographic region." D.E. 70-29 at 5, 9 (Cal Rpt.); *see also* 76-1 at 6, 10-11 (Cal Decl.) ("I believe that I will be able to procure all of the necessary data to produce an atmospheric dispersion model that demonstrates Darling's contribution to the odor that has been reported in the community."). But speculative say-so is insufficient because "Cal has not actually run any AERMOD simulations." *Hamilton*, 2019 U.S. Dist. LEXIS 128217, at *9. In other words, even if the model could generally control for other odor sources, Cal has not demonstrated that he can consider other facilities in this specific instance.[24]

        c.  *Theodore Lamicella's Expert Testimony is Inadmissible Under Rule 702 and Daubert*

Theodore Lamicella is a real estate appraiser and tax assessor with certifications from the States of New Jersey and Pennsylvania. D.E. 70-30 at 11, 13 (Lamicella Decl.). Lamicella has completed courses at Ocean County College, but has not obtained any academic or professional degrees. *Id.* at 11. However, Lamicella has many years of experience as a commercial appraiser and tax assessor, and he provides consulting services to public and private institutions and legal professionals as the Director of Appraisal & Litigation Services at Associated Appraisal Group.

---

[24] Although some of the foregoing evidence involves the original class area, rather than the modified class area, there is sufficient evidence to consider odor sources other than Darling. *See* D.E. 78-46 (Vetrano Decl.) (adopting opinions regarding the original class area for the modified class area). For example, a Facebook group for residents of Society Hill and Droyer's Point includes posts that detail other odor sources, as well as smells associated with other facilities. D.E. 70-28 at 1, 4, 20, 21, 24, 35, 53, 54. Plaintiffs submitted these Facebook posts, which largely preceded this litigation.

*Id.* at 11-12.   Nevertheless, Lamicella is unqualified, his methodology is unreliable, and his analysis does not fit the case.

### i.   *Lamicella Lacks the Requisite Expertise*

Lamicella lacks the requisite expertise to calculate depreciation in property values through the study that he proposes.  Lamicella has extensive experience in real estate and mass appraisals.  D.E. 70-30 at 1-2 (Lamicella Decl.).  But he has never conducted mass appraisals outside the context of tax assessments or sewer and water enhancements, nor has he performed difference-in-differences hedonic regression analyses, neighborhood comparison evaluations, or assessments of property value diminution attributable to environmental sources.[25]   D.E. 73-4 at 29, 54-55 (Lamicella Tr.).  Indeed, while Lamicella has testified that mass appraisals involve regression analyses, he has received no formal training in statistics and does not consider himself an expert in the subject matter.  *Id.* at 24, 33.  Additionally, Lamicella has never served as an expert in a market value diminution case that involves environmental sources or large numbers of properties, nor has he offered opinions in a class action.  *Id.* at 27-29.   Tellingly, Lamicella suggests that he could "oversee" a study undertaken by others at his firm, but without the relevant specialized knowledge, practical experience, or academic training and credentials, he could not ensure the integrity of the study.  D.E. 70-30 at 3 (Lamicella Decl.).

### ii.   *Lamicella Offer Boilerplate Opinions*

To measure any impacts to putative class members resulting from noxious odor emissions, Lamicella proposes a mass appraisal coupled with a neighborhood comparison evaluation.  D.E.

---

[25] A difference-in-differences hedonic regression analysis is a statistical method to determine how different factors, including unobserved factors, impact an outcome over time. *See* H. Spencer Banzhaf, *Difference-in-Differences Hedonics*, NATIONAL BUREAU OF ECONOMIC RESEARCH (Aug. 2019),
https://back.nber.org/appendix/w21485/Diff-in-Diff_Hedonics_Aug_2019.pdf.

70-30 at 4-5 (Lamicella Decl.)   According to Lamicella, the mass appraisal would identify properties, define a market area, identify economic characteristics in that market area, develop a model that reflects those economic characteristics, and apply conclusions from the model to the properties.   *Id.*   The neighborhood comparison evaluation would "then employ the same methodology to assess a similarly situated neighborhood with the same property and economic characteristics, but one without the presence of a facility that was found to be emitting noxious odors."   *Id.*   at 5.   In theory, this analysis would illustrate depreciation in property values in the proposed class area.   *Id.*

In practice, however, Lamicella has not analyzed any diminution in property values, performed any appraisals, or conducted any neighborhood comparisons for the proposed class area.   D.E. 73-4 at 5-6, 12, 40, 42-43, 53 (Lamicella Tr.).   In fact, Lamicella has not even identified the economic characteristics in the market area or a similarly situated neighborhood.   *Id.* Since Lamicella "does not provide any detail about—and in fact does not know—fundamental elements of his proposed analysis," he fails to supply any meaningful connection between scientific knowledge and the case.   D.E. 78-43 at 7 (Phillips Rpt.).   For the same reason, his barebones methodology cannot be tested, controlled, or evaluated for errors.[26]   Thus, Lamicella should be excluded.   *See Morr v. Plains All Am. Pipeline, L.P.*, 2021 WL 4478660, at *6 (S.D. Ill. Sept. 30, 2021) (excluding an expert who "conducted preliminary mass appraisal model development" for a nuisance, trespass, and negligence case, but who did not conduct "analysis specific to this case"); *In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 550 (C.D. Cal. 2014) (excluding an expert who "describe[d] hedonic regression and conjoint" analyses for a consumer fraud case,

---

[26] Nor has Lamicella demonstrated that his approach has been subject to peer review or generally accepted in the scientific community.

but who did "not actually perform either analysis or describe in any detail their specific application to this case").[27]

### iii.   Lamicella Lacks the Necessary Data

To compile the necessary data for his methodology and analysis, Lamicella suggests that he would consult information from the local tax assessor, the federal census, a multiple listing service, another internet service, or aerial images and maps.  *Id.* at 5-6.   However, Lamicella has conceded that data from local tax assessors, multiple listing services, and other internet services are not necessarily accurate, and he believes that he has encountered inaccurate information from the Jersey City tax assessor.   D.E. 73-4 at 9, 30-33 (Lamicella Tr.).   Nor has Lamicella proposed alternative sources of aggregate data.  *See Morr*, 2021 WL 4478660, at *5 (excluding an expert who had not "researched the available residential data necessary to run his model"); *ConAgra*, 302 F.R.D. at 552 (excluding an expert who did not identify "any data presently in his possession to which the models can be applied").   Instead, Lamicella suggests that he would utilize information from "interviews and / or surveys" and he "anticipate[s] that . . . 'on the ground,' verification and collection of additional data may be warranted."   D.E. 70-30 at 6 (Lamicella Decl).   But such interviews, surveys, and on-the-ground verification and collection entail individualized review, which undermines efforts to measure common impact.[28]   *See Clark v. Prudential Ins. Co. of Am.*,

---

[27] In *ConAgra*, the court also found that the expert did not "identify the set of comparator products he would include in his analysis" to assess the impact from an allegedly misleading food advertisement.   302 F.R.D. at 551-52.   Here too, Lamicella has not identified the comparable neighborhood used to assess the impact from the alleged emissions.

[28] Indeed, independent real estate appraisers who have worked in the proposed class area are "unaware of any data" that allows for a class-wide approach and have concluded that "individual analysis of each property" is unavoidable.   D.E. 78-42 at 3-4, 7, 10 (Davey Decl., Lore Decl., Smith Decl.).

289 F.R.D. 144, 199 (D.N.J. 2013) (denying class certification "due to lack of commonality and predominance based on the individualized review necessary").

As with Cal, Plaintiffs suggest that Lamicella should not be excluded because Darling "has repeatedly used [the] Phase I discovery limitation to class certification issues to shield Plaintiffs from discovery of relevant information that would be necessary to actually conduct expert modeling." Lamicella Daubert Opp'n at 16. However, Darling objected to producing "[d]ocuments relating to property values" among ten other categories of documents, and Plaintiffs have not demonstrated that Darling ultimately withheld property value information on discovery limitation grounds. D.E. 77-5 at 32. Moreover, Darling objected to the production on other grounds, including that Plaintiffs sought "information that is publicly available," which Plaintiffs could "obtain themselves from public sources." *Id.* at 33. In any event, Plaintiffs have not explained why documents concerning surrounding property values are likely to be in the custody, possession, or control of a company that operates an animal rendering facility.

### iv.  Lamicella Does Not Account for Other Sources of Odor

According to Lamicella, any "confirmed and documented polluting facility" should be factored into a mass appraisal and neighborhood comparison evaluation. D.E. 70-30 at 4 (Lamicella Decl.).[29] But Lamicella has not investigated other odor sources, nor is he aware of how he would allocate depreciation in property values among different polluters.[30] D.E. 73-4 at 12, 14-15, 46-47, 50-52 (Lamicella Tr.). Thus, Lamicella "has no method for determining whether those sources—instead of or in addition to the alleged odors from the Darling Facility—might

---

[29] As detailed above, there are numerous confirmed and document polluting facilities around the proposed class area.

[30] Although Lamicella may "believe" he will be able to allocate proportions of property value decreases among different facilities, he has not articulated any means of doing so. D.E. 73-4 at 13 (Lamicella Tr.).

contribute to any diminution in value his analysis might find." D.E. 78-43 at 7 (Phillips Rpt.); *see also ConAgra*, 302 F.R.D. at 551-52 (excluding an expert who could not "determine the portion of any calculated price premium attributable to . . . other possible interpretations" of an allegedly misleading food advertisement).

### v.   Lamicella Cannot Measure the Entire Relevant Period

Additionally, Lamicella cannot measure depreciation in property values throughout the entire relevant period, as his approach only provides "a snapshot in time." D.E. 73-4 at 42-43, 55 (Lamicella Tr.). In other words, Lamicella proposes to calculate impact at a particular temporal moment, but his methodology and analysis cannot discern whether this impact applies to a broader stretch of time. And even if Lamicella could attribute diminution in property values to an extended interval, he has not identified a time frame for his approach. *Id.*

### vi.   Lamicella Cannot Measure Renter Impact

Lamicella also fails to account for renters who are part of the putative class. Indeed, the study proposed by Lamicella is intended to measure depreciation in property values, which only impacts owners in the putative class. D.E. 78-43 at 6 (Phillips Rpt.). "Renters – who have no ownership interest in the property they occupy – cannot suffer diminution in property value damages." *Id.* Lamicella cannot even isolate renters from the putative class to calculate the impact to owners, as he does not know the number of properties that are owner-occupied versus renter-occupied or any class-wide means to obtain this information. D.E. 73-4 at 3-4 (Lamicella Tr.). To his knowledge, the only means to discern the number of owner-occupied versus renter-occupied properties is through "direct survey." *Id.* However, such individualized inquiry defeats the purposes of his approach, which is to determine impact on a common basis.

24

### vii. *Lamicella Cannot Measure Individual Impact*

Relatedly, Lamicella fails to account for individual variation within the putative class.  As an initial matter, any diminution in value would "be applied uniformly to the properties within the class, irrespective of their differing characteristics" or qualities.  D.E. 70-30 at 5 (Lamicella Decl.).  For example, "a 5% loss of value caused by the neighboring emitting facility" would be used "to determine the loss of value to every property" in the proposed class area, and the same rate would be deducted from the value of each home.  *Id.*  Thus, Lamicella proposes a study that can only measure "average diminution in value across all properties in the Proposed Class Area."  D.E. 78-43 at 7 (Phillips Rpt.); *see also* D.E. 73-4 at 44-45 (Lamicella Tr.).  But "a court cannot just aggregate plaintiffs who suffered damages with plaintiffs who did not suffer damages and then disburse 'average' damages."  *Dzielak v. Whirlpool Corp.*, 2017 WL 6513347, at *14 (D.N.J. Dec. 20, 2017).[31]  The class-wide means offered to determine impact should resolve individualized issues, not sidestep them altogether.[32]

Lamicella not only disregards individual variation in property value depreciation, but also ignores individualized issues regarding the nature of the impact experienced by putative class members.  Some class members could have experienced property value diminution without any

---

[31] In *Dzielak*, plaintiffs alleged that washing machines were not as efficient as advertised and that higher energy costs were paid as a result.  2017 WL 6513347, at *2.  To measure injury, plaintiffs proposed to "use estimates of energy expense . . . and attempt to apply it to the entire class—regardless of each individual's energy [expense] and regardless of whether the class member suffered any energy-expense injury at all."  *Id.* at *12.  The Court found this purportedly "representative evidence" to be inadequate and concluded that there was no class-wide means to measure injury.  *Id.* at *11-14.  Here too, the Court finds the purportedly representative evidence to be inadequate and concludes that impact cannot be measured on a common basis.  Indeed, the same loss in property value cannot be applied across the entire class regardless of individual variation in loss and regardless of whether a class member suffered a loss at all.

[32] Although Lamicella suggests that "many, if not most, properties could be disaggregated into categories," he does not describe this process in any detail or explain how it would resolve individualized issues.  D.E. 70-30 at 7 (Lamicella Decl.).

impact to the use and enjoyment of their property.[33]  Others could have experienced a disturbance to the use and enjoyment of property without any impact to their property value.  However, Lamicella only provides a single theory of impact, which does not necessarily apply to every class member.

For the putative class, individual variation in impact is not merely theoretical, but a manifest reality.  Of the surrounding residents who provided Darling with signed statements, most indicated that they did not smell any odors, and some suggested that the odors did not disturb the use and enjoyment of their property.[34]  D.E.s 70-37, 70-38, 70-39, 70-40, 70-47; *see also* D.E. 72-5 at 40, 44 (Vetrano Rpt.).  Moreover, independent real estate appraisers who have worked in the proposed class area have never found odors from Darling to affect the market value of residential properties.  D.E. 78-42 at 4, 7, 10 (Davey Decl., Lore Decl., Smith Decl.); *see also* D.E. 78-43 at 6 (Phillips Rpt.).  Thus, no matter the theory of impact, individualized issues abound.  *See Hamilton*, 2019 U.S. Dist. LEXIS 128217, at *5 ("Even if all class members were exposed to [the] odors, individual inquiries would be required to determine whether the odor was strong enough to interfere with the [use or] enjoyment of individual class members' property, or whether individual class members experienced an actual loss . . . .").[35]

---

[33] *But see Burke v. Hemlock Farms Cmty. Ass'n*, 2009 WL 3601592, at *5 (M.D. Pa. Oct. 28, 2009) (the use and enjoyment of property is impacted by a decrease in property value).

[34] Similarly, putative class members who posted to Facebook sometimes expressed different views about whether odors could be smelled in the community.  D.E. 70-28 at 20, 21, 43.

[35] Nor does Cal's approach resolve these individualized inquiries, as an AERMOD model cannot determine which individuals were disturbed in the use and enjoyment of their property, nor can it determine which individuals experienced decreased property values.  D.E. 72-3 at 27-29 (Cal Tr.).  Plaintiffs argue that disturbance to the use and enjoyment of property is an objective standard.  Class Cert. Br. at 41; *see also Smith*, 2011 WL 810065, at *3 (quoting *Rowe*, 262 F.R.D. at 459) ("A harm is significant if 'normal persons living in the community would regard the invasion in question as definitely offensive, seriously annoying or intolerable . . . .'").  In the abstract, an AERMOD model could meet this standard by providing "an objective quantification of the concentration of . . . odorous emissions in specific locations across a geographic area."  D.E. 76-1

Plaintiffs argue that individual variation in impact is unimportant at this stage because "individualized issues relating to the amount of each class members' damages are insufficient to defeat class certification."  Class Cert. Br. at 40; *see also Neale*, 794 F.3d at 374-75 (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 42 (2013) (Ginsburg, J. & Breyer, J., dissenting)) ("'[R]ecognition that individual damages calculations do not preclude class certification under Rule 23(b)(3) is well nigh universal.'"); *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 456 (3d Cir. 1977) ("[I]t has been commonly recognized that the necessity for calculation of damages on an individual basis should not preclude class determination when the common issues which determine liability predominate.").  However, "the plaintiffs gloss over the fact that when courts speak of damages, they are often referring to two distinct concepts: the fact of damage and the measure/amount of damages." *Harnish*, 833 F.3d at 305 (internal citations omitted).  Unlike the amount of damages, "[t]he fact of damage, often synonymous with injury or impact, is frequently an element of liability requiring plaintiffs to prove that they have suffered some harm traceable to the defendant's conduct." *Id.*  Because liability for nuisance and negligence depends upon impact, Lamicella cannot be excused for his failure to prove loss to property value or disturbance to the use and enjoyment of property "on a common basis." *Id.* at 306.[36]

Since the qualifications, reliability, and fit requirements are not uniformly satisfied, the expert testimonies of Cal and Lamicella are inadmissible under Rule 702 and *Daubert* and cannot

---

at 7 (Cal Decl.).  However, Cal has not demonstrated that he can run an AERMOD model in this case.  Likewise, Lamicella has not demonstrated that he can provide an objective quantification of impact to the use and enjoyment of property.

[36] For this reason, *Olden v. LaFarge Corp.* is inapposite.  There, the court found that "that individual damage determinations might be necessary, but the plaintiffs have raised common allegations which would likely allow the court to determine liability (including causation) for the class as a whole." 383 F.3d 495, 508 (6th Cir. 2004).  Here, Darling has not merely invoked variety in the *measure* of damages, but their very existence.

be used to satisfy Rule 23's predominance requirement.[37]   But even if the Court does not exclude

Cal and Lamicella, it would still find the predominance requirement unsatisfied, as their expert

testimonies are insufficient to demonstrate that the central, predominant issues in the case are

common.[38]

### 3.   The Superiority Requirement is Not Satisfied

To determine superiority, the Court considers, among other things, "the likely difficulties

in managing a class action." Fed. R. Civ. Pr. 23(b)(3).   The superiority requirement "asks the court

to balance, in terms of fairness and efficiency, the merits of a class action against those of

alternative available methods of adjudication."   *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d

516, 533-34 (3d Cir. 2004) (internal citations omitted).   Ultimately, courts have found "substantial

---

[37] The remaining cases cited by Plaintiffs are unpersuasive.   As an initial matter, each case involves class certification under a state rule, as opposed to Rule 23.   *See Sutton v. Apex Env't, LLC*, 20-cv-116 (Ohio Ct. Com. Pl., Jefferson Cnty, Sep. 23, 2022) (at 76-2) (Ohio Civil Rule 23); *Gonzalez, et al. v. Clark-Floyd Landfill, LLC*, 10C02-1608-CT-000131 (Ind. Cir. Ct., Clark Cnty., Oct. 18, 2019), *aff'd* 19A-CT-02680 (Ind. Ct. App. Dec. 16, 2020) (Indiana Trial Rule 23); *Baranofky, et al. v. Rousselot Peabody, Inc.*, 2084-cv-00896-BLS2 (Mass. Super. Ct., Suffolk Cnty., June 13, 2022) (Mass. Rule of Civil Procedure 23); *Dudley et al. v. API Indus. d/b/a Aluf Plastics*, 030905/2018 (N.Y. Sup.Ct., Rockland Cnty., Jan. 3, 2022) (N.Y. Civil Practice Law and Rule 901).   But state law for class certification often differs from federal law.   *See, e.g.*, *Weld v. Glaxo Wellcome Inc.*, 434 Mass. 81, 87 & n.8 (2001) (Massachusetts law "does not mandate an early ruling on certification," so plaintiffs "do not bear the burden of producing evidence sufficient to prove that the [class certification] requirements have been met.").   Moreover, *Baronofsky* is unpersuasive for other reasons.   In that case, the ascertainability requirement was less stringent, the class definition was based on expert modeling, the defendant had not provided evidence of alternative odor sources, and there was evidence that "the vast majority of putative class members . . . suffered compensable injury."   D.E. 70-6 at 2-3, 4, 8, 11.   *Aluf* is also unpersuasive for additional reasons.   There, the AERMOD model was subject to the *Frye* standard, the smells noticed by putative class members were generally unassociated with alternative odor sources, and Cal conducted "data collection, mapping, and analysis to measure Defendant's emissions from their facility's five vertical stacks" and concluded "that the residents who reported noxious odors . . . [were] definitively in the path of 'odor transport' from the Defendant's facility."   D.E. 70-7 at 31-32, 35, 44-45.

[38] In similar cases, courts have declined to certify the classes at issue, even without excluding the relevant expert testimonies.   *See Tropicana*, 2017 WL 2362848; *Brooks*, 2017 WL 1198542; *Hamilton*, 2019 U.S. Dist. LEXIS 128217.

overlap in the superiority and predominance inquiries." *Kelly v. RealPage Inc.*, 47 F.4th 202, 215 n.11 (3d Cir. 2022).

Here, the Court is likely to encounter difficulties in managing the class action due to the individualized issues that will predominate in the litigation.  In other words, for the same reasons that the predominance requirement is not satisfied, the merits of a class action are unclear in terms of fairness and efficiency.  Plaintiffs argue that alternative methods of adjudication are inferior because "the discovery and motion practice involved becomes extensive, time-consuming, and inefficient."  Class Cert. Opp'n at 7-8.[39]  But Plaintiffs' general arguments would dictate the certification of most putative classes without regard for the specifics of each case.  Thus, on balance, the superiority requirement is not satisfied.

## IV.   CONCLUSION

For the above reasons, the motions to exclude will be **GRANTED** and the motion for class certification will be **DENIED**.  An appropriate Order accompanies this Opinion.

Dated**:** June 6, 2023

Evelyn Padin, U.S.D.J.

---

[39] Specifically, Plaintiffs argue that "defendants typically issue duplicative discovery requests and depose each of the named plaintiffs[,] procuring nothing but overwhelmingly redundant testimony."  Class Cert. Opp'n at 8 n.8.  Additionally, Plaintiffs argue that "the complaint will invariably be amended numerous additional times to add to the never-ending stream of litigants who come forward throughout the process as they learn about the case from their neighbors."  *Id.*